IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| UNITED STATES OF AMERICA | |
|---|---|
| v. | CRIMINAL CASE NO. 1:11-cr-00255-TWT-RGV |
| STACEY DOOLEY | |

**ORDER FOR SERVICE OF MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Attached is the Report and Recommendation of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and Local Criminal Rule 59(2)(a)-(b). Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. Failure to object to this Report and Recommendation waives a party's right to review. Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(D) and (H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED**, this 6th day of September, 2012.

*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL CASE NO. |
| | 1:11-cr-00255-TWT-RGV |
| STACEY DOOLEY | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Stacey Dooley ("Dooley") is one of nine defendants charged in a fifteen-count indictment with (1) unlawfully obstructing, delaying, and interfering with interstate commerce by taking personal property in the custody and control of armored car couriers by means of actual and threatened force, violence, and fear of injury, and conspiring to do so, in violation of 18 U.S.C. §§ 1951 and 2; (2) carrying and using a firearm in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2; and (3) using a firearm in relation to a crime of violence wherein a death occurred, in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(j)(1), and 2. See [Doc. 312].[1]  Dooley moves to suppress evidence seized from his vehicle pursuant to an allegedly constitutionally defective warrant.  [Doc. 212].  The government has filed

---

[1] The listed document and page numbers in citations to the record in this Report and Recommendation refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

a response, [Doc. 282], to which Dooley has filed a reply, [Doc. 297]. For the following reasons, it is **RECOMMENDED** that Dooley's motion to suppress, [Doc. 212], be **DENIED**.

## I. STATEMENT OF FACTS

Dooley was arrested around 8:30 a.m. on March 30, 2011. [Doc. 212-1 (Impala Warrant & Application) at 27, 29]. At the time of his arrest, Dooley was driving a red, 2008 Chevy Impala LT 4S (the "Impala"). [Id.]. Later that day, Detective A.R. Whaley ("Detective Whaley") of the Gwinnett County Police Department ("GCPD") submitted an affidavit and application for a search warrant for the Impala, [id. at 1], and a second, but substantially identical, affidavit and application for a search warrant for a residence located at 5015 Michael Jay Street, Snellville, Georgia (the "Jay Street residence"), see [Doc. 212-2 (Jay Street Residence Warrant & Application)]. At 3:47 p.m. that day, a Gwinnett County Superior Court Judge signed a warrant authorizing law enforcement officers to search the Jay Street residence. See [id. at 1727]. Eight minutes later, at 3:55 p.m., the same judge signed the warrant authorizing law enforcement officers to search the Impala. [Doc. 212-1 at 1824].

The affidavit submitted with the search warrant applications outlines the investigation of the GCPD and the Federal Bureau of Investigation ("FBI") into a

series of armored car robberies. See [Id. at 3-8].² Specifically, the affidavit describes how police identified a 2008-2009 Buick La Crosse Super at the scene of one of the robberies, obtained a list of every registered black 2008-2009 Buick La Crosse Super in the state of Georgia, and narrowed that list down to eight vehicles based on a comparison of the robbery victims' descriptions of the suspects to the license photos of the car owners. See [id. at 8]. Further investigation revealed that only one vehicle, a dark brown Buick La Cross Super owned by Anita Booker ("A. Booker"), was a potential match. [Id. at 9]. The affidavit then describes how fingerprints, phone records, and information from informants³ led police to identify more individuals allegedly involved in the string of armored car robberies, including Booker, who was married to A. Booker, the owner of the Buick La Crosse. [Id. at 9-14, 17-18, 21-22].

---

² Since the affidavits for the two search warrants are identical, this Report and Recommendation will cite only to the affidavit accompanying the Impala warrant, [Doc. 212-1], when referring to the facts in the affidavit.

³ In particular, the affidavit relates information from interviews with Warren Pope ("Pope"), Tramel Bennett ("Tramel"), and Donavan Thomas, who had all spoken with Christopher Bennett ("Christopher"), an alleged co-conspirator in the robberies whose fingerprints were recovered from a getaway vehicle and whose body was discovered on January 26, 2011, in DeKalb County. See [Doc. 212-1 at 9, 11]. These individuals informed police that Christopher had admitted to them his involvement in the armored car robberies and told them that co-defendant Quentin Booker ("Booker") was responsible for planning the robberies. [Id. at 11-12]. Pope also told police that Christopher had informed him that "Chicken" and "Teddy" were also involved in the robberies. [Id. at 12]. Tramel confirmed that "Chicken" and "Teddy" were part of Booker's "crew." [Id. at 14]. The investigation later revealed that "Chicken" was Dooley's nickname. [Id. at 19].

3

Phone records revealed that Booker's cell phone was in close proximity to each of the armored car robberies being investigated and that it moved away from each location immediately after the robbery took place. [Id. at 18].

Detective Whaley further reports in the affidavit that during the investigation, court-authorized interceptions of communications revealed that Dooley called Booker on March 20, 2011, and that the two men engaged in a conversation, allegedly speaking in "code" about an earlier armored car robbery and preparation for the next robbery. [Id. at 19-21].[4] In this conversation, Dooley also mentioned a red vehicle he owned that had been stolen, but which he had recovered. [Id.]. The Impala, a red vehicle, which was registered to Dooley's girlfriend, Desiree Jones ("Jones"), had been

---

[4] Detective Whaley stated that "based upon [his] training and experience, [speaking in code] is a common tactic used by individuals engaged in criminal activity in an attempt to conceal their illegal endeavors." [Doc. 212-1 at 19]. Specifically, during the conversation Dooley told Booker that "shit was ugly and unreal and Booker acknowledged him." [Id.]. Dooley then stated that "they were just giving that pussy away" and talked about how they "didn't do their 'homework,'" but that he had already "put the homework in." [Id. at 20]. Booker asked him when he "wants to do that" and Dooley replied "whenever you're ready." [Id.]. Detective Whaley believed that this conversation referenced a murder during a DeKalb County armored car robbery which had taken place on March 15, 2011. [Id. at 19-20]. He believed that Dooley was telling Booker that it was easy to rob guards, but that the last robbery had not been preceded by sufficient surveillance and intelligence. [Id. at 20]. Detective Whaley interpreted the rest of the conversation to indicate that Dooley had already done some surveillance on a new target, so he was ready for another armed robbery whenever Booker was. [Id.].

observed parked outside Dooley's home, the Jay Street residence.[5]  [Id. at n.4].  On March 17, 2011, a detective observed another vehicle that had been identified at one of the armed robberies, a Buick Park Avenue, parked outside Dooley's home.  [Id. at 22].

The affidavit then continues to summarize information obtained from GPS tracking and ground surveillance of the Impala.  See [id. at 26-27].  The GPS tracking system on the Impala, which several surveillance units had seen Dooley driving,[6] indicated that the vehicle left Dooley's residence on March 27, 2011, and traveled to DeKalb County, where it circled and sat in the parking lot of a Wells Fargo Bank on the same armored car route as two other bank locations that Booker had allegedly previously surveilled.  [Id. at 26].  Based on the driving pattern, Detective Whaley believed that "the vehicle was possibly checking for routes of escape, to distinguish from dead-end streets, and for a place to possibly abandon a vehicle."  [Id.].  On

---

[5] The Jay Street residence was identified as Dooley's residence because he had a current water account at that address.  [Doc. 212-1 at 21].

[6] For example, the affidavit describes an event on March 22, 2011, when surveillance at Dooley's Jay Street residence revealed two males, one of whom was identified as Dooley, enter the Impala.  [Doc. 212-1 at 23 (stating that a GPS "ping" (identifying the position of a cell phone through GPS data) revealed that Dooley's phone, the number of which had been previously identified, was located in the Impala at that time)].  The Impala drove to a Bank of America, where video surveillance and bank records indicate that either Dooley or his brother, Donyale Dooley, see [id. at 19], who both have a similar build and facial features and use each other's names, entered the bank to conduct a transaction, [id. at 23].

March 29, 2011, GPS tracking and ground surveillance revealed that the Impala traveled to a Bank of America in Duluth, once again driving around the building and surrounding area. [Id.]. The Impala then returned to Dooley's Jay Street residence, where Dooley spoke with Jones via telephone. [Id.]. Detective Whaley stated that he believed this conversation was likely about an impending armed robbery, corroborating earlier conversations where Dooley had told Jones he was going to get some money so that they could go to North Carolina and get married.[7] [Id. at 27].

The affidavit states that on March 30, 2011, Dooley again drove the Impala to the Bank of America in Duluth. [Id.]. FBI ground surveillance, a GPS tracker, and phone pings all confirmed that Dooley was in the Impala traveling to the bank. [Id.]. The Impala again drove around in a manner consistent with "casing" the bank. [Id.]. At 8:07 a.m., Dooley called Jones, and their conversation contained frustrated, profanity-laced references to the armored car guards and the planned robbery, and a discussion of Dooley's alleged accomplice, Ashley Henderson ("Henderson"), and his role in getting rid of the car. [Id. at 27-28]. Dooley then placed a phony 911 call, which Detective Whaley testified was likely an attempt to create a diversion by reporting a false crime at a location away from the bank. [Id. at 28]. Dooley then

---

[7] Specifically, Jones asked Dooley if everyone would be shocked, and Dooley confirmed but stated that he was scared and nervous. [Doc. 212-1 at 27]. Dooley also told Jones that "after this one, they will be done," and that he and Jones would be able to get married and be happy. [Id.].

placed another call to Jones, telling her he "can't do it," indicating that Dooley had realized he was under FBI surveillance. [Id. at 28-29]. He gave Jones instructions to initiate a three-way call that permitted him to communicate with Henderson, who was on foot at the Bank of America location, and call off the armed robbery, telling Henderson that "them big boys are following us." [Id. at 29]. FBI agents saw Dooley pick Henderson up in the Impala, which then left the area of the bank. [Id.]. FBI surveillance teams stopped the Impala and detained both occupants: Dooley, who was driving, and Henderson, the passenger. [Id.].

## II. DISCUSSION

Dooley moves to suppress all evidence obtained from the search of his vehicle, contending that the application and affidavit did not establish probable cause to issue a search warrant for the Impala because the "affidavit in support of that warrant stated that the affiant believed that the evidence presented in the affidavit established 'probable cause to search the residence at 5015 Michael Jay Street . . . .'" [Doc. 212 at 2-3]. In response, the government asserts that "the affidavit to the search warrant merely contains an error, and a simple error does not translate into a constitutional violation." [Doc. 282 at 2]. The government contends that when read in the context of the entire warrant and affidavit, it becomes "abundantly clear" that the affidavit

and warrant at issue identified Dooley's vehicle.[8] [Id.]. The government also asserts that even if the search warrant was insufficient under the Fourth Amendment, suppression of the evidence is not required under the good faith exception to the exclusionary rule. [Id. at 2-3]. Dooley replies by reasserting that the affidavit did not establish probable cause to search the Impala, noting that the Impala affidavit lists "documents relating to ownership of residence and actual identity of occupants at residence" and the Impala itself as items to be "searched for and seized," indicating that the residence, not the Impala, was the focus of the affidavit. [Doc. 297 at 3]. He also contends that the government failed to meet its burden to show that the good faith exception to the exclusionary rule applies.[9] [Id. at 4-5].

---

[8] The government characterizes Dooley's argument as a challenge to the particularity of the search warrant. See [Doc. 282 at n.1]. However, in his reply, Dooley specifically states that he "is not raising a particularity challenge to the search warrant," but is instead asserting that "the warrant is defective because it does not establish probable cause to search the car." [Doc. 297 at 4]. In response to this assertion, the government filed a sur-reply addressing the probable cause argument. [Doc. 306]. Accordingly, the undersigned will evaluate Dooley's argument by evaluating whether the warrant was supported by probable cause.

[9] Dooley also mentions that he has "challenged the placement of the GPS tracking device on his vehicle" in a separate motion, and that since the warrant pertaining to the Impala relied in part upon the information learned from the GPS tracking at issue, it is subject to suppression as a fruit of that illegal search. See [Doc. 212 at 6 n.1]. This independent basis for suppressing evidence seized as a result of the search of the Impala will be addressed in a separate Report and Recommendation concerning the warrantless placement of GPS tracking devices, and at this time the Court will consider only whether the affidavit established probable cause to search the vehicle, instead of just the Jay Street residence, as

## A. Sufficiency of the Impala Search Warrant

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; see also Fed. R. Crim P. 41(c); United States v. Young, No. CR210-065, 2011 WL 494776, at *2 (S.D. Ga. Jan. 20, 2011), adopted by 2011 WL 497471, at *1 (S.D. Ga. Feb. 7, 2011). Considering the totality of the circumstances, a determination of probable cause entails a "practical, common-sense decision . . . [by the issuing judge], . . . [that] there is a fair probability that . . . evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). An issuing judge's probable cause determination "is to be given great deference and is conclusive, if reasonable, absent arbitrariness." United States v. Sweeting, 933 F.2d 962, 964 (11th Cir. 1991) (citations omitted); see also United States v. Ventresca, 380 U.S. 102, 109 (1965); United States v. Scott, 555 F.2d 522, 527 (5th Cir. 1977).[10]

Under this standard, the Court finds that there was probable cause to issue the search warrant for the Impala. The lengthy affidavit submitted in support of the

---

Dooley contends.

[10] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

application for the search warrant connects Booker and the robberies to Dooley and then connects Dooley to the Impala. See [Doc. 212-1 at 3-22]. The affidavit clearly sets out facts, including intercepted telephone conversations discussing the robbery and police surveillance of the Impala while it appeared to be "casing" the Bank of America, from which the issuing judge could find probable cause to believe that Dooley was using the Impala in connection with planning a robbery. [Id. at 26-29]. Moreover, the affidavit establishes that Dooley was driving the Impala on March 30, 2011, when he was arrested, and sets forth facts, including Dooley's conversations with Jones and Henderson, that provide ample support for the affiant's belief that Dooley intended to commit a robbery that day while driving the Impala, but called it off when he realized that he was under surveillance. [Id. at 27-29]. Accordingly, the affidavit does much more than merely "mention[] the place to be searched," [Doc. 297 at 2]; it establishes a "fair probability" that evidence of a planned armed robbery would be found in the Impala, the vehicle that Dooley was driving while communicating on a cell phone with other individuals as they appeared to be preparing to commit a robbery and when he was arrested after traveling to the bank the day the robbery was expected to take place, see Gates, 462 U.S. at 238; see also United States v. Sneed, 385 F. App'x 551, 557 (6th Cir. 2010) (unpublished) (finding search warrant for a vehicle to be based on probable cause where affidavit considered

10

as a whole connected defendant to robberies and supported an inference that defendant would have kept instrumentalities from the robbery in the vehicle); United States v. Cotton, No. 8:05CR116, 2005 WL 3133776, at *4-5 (D. Neb. Nov. 23, 2005) (finding search warrants for vehicles to be based on probable cause where the affidavit showed that defendants had been implicated by co-conspirators and defendants were each arrested driving one of the vehicles).

Dooley contends that the concluding sentence of the affidavit, which states that Detective Whaley believes the facts establish probable cause to search the Jay Street residence, and the description of items to be seized, which includes documents relating to the ownership and occupants of a residence,[11] show that the affidavit was concerned only with the Jay Street residence and therefore did not establish probable cause to search the Impala. See [Doc. 212; Doc. 297 at 2-3]. However, these errors or

---

[11] Dooley also asserts that the affidavit "places [the Impala] in the category of items that are to be 'searched for and seized.'" [Doc. 297 at 3 (citing [Doc. 212-1 at 30])]. However, a review of the search warrant itself shows that the property to be searched for and seized consists of: (1) U.S. currency; (2) documents relating to ownership of residence and actual identity of occupants fo the residence; (3) ledgers and documents related to any associates of [Booker] or [Dooley] or Donyale Dooley; (4) cell phones, sim cards, thumb drives or any other digital devices that could reasonably contain names, addresses, and phone numbers; (5) phone records; (6) any guns, parts of guns, or documentation establishing ownership of a gun; and (7) ammunition, or parts or components thereof. [Doc. 212-1 at 1, 31]. This list, contrary to Dooley's assertion, does not include the Impala itself. See [id.].

alleged inconsistencies[12] on the concluding page of the affidavit do nothing to change the fact that the rest of the asserted facts are "sufficient to justify a conclusion that evidence or contraband will probably be found [in the Impala]." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002). Indeed, the affidavit established probable cause to believe that a cell phone may be found in the vehicle since surveillance revealed that Dooley was using a cell phone to communicate with co-conspirators while he was driving the Impala.[13] Moreover, since firearms had been used in the prior robberies, there was probable cause to believe that guns and ammunition would be found in the vehicle that Dooley was driving and in which Henderson was a passenger when they were arrested after calling off the planned robbery. Thus, the judge's decision to issue the search warrant was reasonable and non-arbitrary, see

---

[12] Moreover, although Dooley contends that "searching a car will not reveal documents relating to the ownership of the residence or identity of the occupants of the residence," [Doc. 297 at 3], the affidavit connected Dooley to both the Jay Street residence and the Impala, and a car could easily contain various documents relating to residence and identity, including driver's licenses, vehicle registration, and insurance cards, see United States v. Butler, 793 F.2d 951, 953-54 (8th Cir. 1986) (noting that a "driver's license [is] evidence tending to show identity of an occupant of [a] residence").

[13] The affidavit also states that Dooley was using multiple cell phones to communicate with co-conspirators, [Doc. 212-1 at 25], and any cell phone found in the car reasonably could be expected to contain names, addresses, phone numbers, and records of communications between Dooley and Booker and other co-conspirators.

12

Sweeting, 933 F.2d at 964, and it is **RECOMMENDED** that Dooley's motion to suppress, [Doc. 212], be **DENIED**.

**B.     Good Faith Exception**

Even if the Court determined that the search warrant for the Impala was not supported by probable cause, the evidence seized from the vehicle pursuant to the warrant would not be subject to suppression if the police reasonably relied in good faith on the search warrant. Under United States v. Leon, 468 U.S. 897 (1984), "the good faith exception to the exclusionary rule 'stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause.'" United States v. Vanbrackle, 397 F. App'x 557, 559 (11th Cir. 2010) (per curiam) (unpublished) (quoting Martin, 297 F.3d at 1313); United States v. Robinson, 336 F.3d 1293, 1295-96 (11th Cir. 2003). The exception is founded on the principle that the exclusionary rule "is designed to deter police misconduct rather than to punish the errors of judges and magistrates," Leon, 468 U.S. at 916; see also Herring v. United States, 555 U.S. 135, 137 (2009) ("[T]he question [of suppression] turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct."), and "[p]enalizing the officer for the magistrate's

error, rather than his own, [therefore] cannot logically contribute to the deterrence of Fourth Amendment violations," Leon, 468 U.S. at 921.

The Supreme Court has outlined four situations in which the good faith exception does not apply and suppression is warranted: (1) where the issuing judge was mislead by information the affiant knew was false or which was made with reckless disregard for the truth; (2) where the issuing judge abandoned his or her role as a neutral and detached judicial officer; (3) where the affidavit in support of the warrant so lacked an indicia of probable cause as to render belief in its existence entirely unreasonable; and (4) where the warrant itself was so facially deficient that the executing officers could not reasonable presume it to be valid. Leon, 468 U.S. at 923; United States v. Accardo 749 F.2d 1477, 1480 n.4 (11th Cir. 1985). Under this exception, good faith is an objective standard judged by what a reasonable law enforcement officer would perceive under the circumstances, not a standard judged by a legally trained magistrate or judge. United States v. Taxacher, 902 F.2d 867, 871-72 (11th Cir. 1990).

Dooley contends that the errors in the affidavit, including one instance in which the place to be searched is misidentified and an allegedly illogical entry on the list of items to be searched or seized, render the resulting warrant unconstitutional. See [Doc. 212-1 at 30]. However, excluding evidence as a result of this kind of error

does not serve the purpose of the exclusionary rule, as it was "designed as a means of deterring police misconduct, not mistakes by court employees." Arizona v. Evans, 514 U.S. 1, 14 (1995); see also Massachusetts v. Sheppard, 468 U.S. 981, 990-91 (1984) ("Suppressing evidence because the judge failed to make all the necessary clerical corrections . . . will not serve the deterrent function that the exclusionary rule was designed to achieve."). Moreover, the record contains no evidence suggesting that the issuing judge was affirmatively misled by the affiant or abandoned his or her neutral role in the judicial process, see Leon, 468 U.S. at 923, nor was the affidavit such a "bare-bone statement of nothing more than conclusory allegations" as to render belief in its existence unreasonable or the warrant so facially deficient that an officer could not reasonably rely on it,[14] United States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998) (citation and internal marks omitted); see also United States v. Gonzalez, Criminal Action File No. 1:09-CR-00371-TWT/AJB, 2010 WL 2721882, at * 20-21 (N.D. Ga. May 25, 2010), adopted by 2010 WL 2721540, at *1 (N.D. Ga. July 7, 2010) (citations omitted) (stating a search warrant for a residence was "not so lacking in probable cause indicia" and finding that the good faith exception applied where the supporting affidavit contained specific facts establishing a nexus between a

---

[14] In fact, the warrant itself contains no errors at all; only the affidavit erroneously identifies the place to be searched in one instance. See [Doc. 212-1 at 30-32].

15

robbery and the place to be searched and there was temporal proximity between the robbery and the search). Thus, even were the Court to find that the search warrant for the Impala violated the Fourth Amendment, the good faith exception to the exclusionary rule would apply and Dooley's motion to suppress is due to be denied.

### III.  CONCLUSION

For the foregoing reasons and cited authority, it is **RECOMMENDED** that Dooley's motion to suppress evidence, [Doc. 212], be **DENIED**.

**IT IS SO RECOMMENDED**, this 6th day of September, 2012.

*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE