IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

STACEY DOOLEY

CRIMINAL CASE NO.
1:11-cr-00255-TWT-RGV

## <u>ORDER FOR SERVICE OF REPORT AND RECOMMENDATION</u>

Attached is the Report and Recommendation of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and Local Criminal Rule 59(2)(a)-(b). Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. Failure to object to this Report and Recommendation waives a party's right to review. Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(D) and (H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED** and **DIRECTED**, this 6th day of September, 2012.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | |
| v. | CRIMINAL CASE NO. |
| | 1:11-cr-00255-TWT-RGV |
| | |
| STACEY DOOLEY | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Stacey Dooley ("Dooley") is one of nine defendants charged in a fifteen-count second superseding indictment with (1) unlawfully obstructing, delaying, and interfering with interstate commerce by taking personal property in the custody and control of armored car couriers by means of actual and threatened force, violence, and fear of injury, and conspiring to do so, in violation of 18 U.S.C. §§ 1951 and 2; (2) carrying and using a firearm in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2; and (3) causing the death of a person through using a firearm in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(j)(1), and 2. See [Doc. 312]. Pending before the Court is Dooley's motion to suppress statements. [Doc. 203]. Following an evidentiary hearing on December 16, 2011, on Dooley's motion to suppress,[1] Dooley filed a post-hearing

---

[1] See [Doc. 303] for a transcript of the evidentiary hearing. Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)." In

brief, [Doc. 393], to which the government responded, [Doc. 401], and the pending

motion is ready for ruling.  For the following reasons, it is **RECOMMENDED** that

Dooley's motion to suppress, [Doc. 203], be **DENIED**.

## I.  STATEMENT OF FACTS

On March 30, 2011, Dooley was arrested on state charges in connection with

a series of armored car robberies that had occurred in Gwinnett and DeKalb

Counties,[2] and he was transported to the Gwinnett County Police Department

("GCPD") where he was interviewed by state and federal law enforcement officers.[3]

(Tr. at 8-9, 57).  Dooley was first interviewed by GCPD Sergeant Cleophas Atwater

("Sergeant Atwater") and Detective Andrew Whaley ("Detective Whaley") in an

---

addition, the parties submitted exhibits during the hearing, which will be referred to
as "(Gov. Ex. ___)" for the government's exhibits and ("Def. Ex. ___") for Dooley's
exhibits.

[2] The investigation of these crimes was a "multi-district, multi-jurisdictional
investigation."  (Tr. at 56).  Gwinnett County, DeKalb County, the City of Marietta,
and the Federal Bureau of Investigation ("FBI") were all involved in the investigation.
(Id.).  Investigators from all jurisdictions had been exchanging information and
working together, and the arrests made on the morning of March 30, 2011, were a
"coordinated effort."  (Tr. at 56-57); see also (Tr. at 75, 79).

[3] Dooley was arrested on a warrant from Gwinnett County, and he was
transported to the GCPD.  (Tr. at 57).  The GCPD has interview rooms that are
electronically monitored.  (Tr. at 12).  There is a central room where all of the
interview rooms can be viewed simultaneously. (Id.).  On this day, there were a total
of four interviews going on and recordings of the interviews were made.  (Id.); see
also (Gov. Ex. 2).

interview room at GCPD.[4]  (Tr. at 42); see also (Gov. Ex. 2 at 9:29:00).  Upon entering

the interview room, the officers introduced themselves and asked Dooley if he had

to use the restroom.  (Id. at 9:29:00 to 9:30:55).  When Dooley responded that he did

not, Sergeant Atwater proceeded to ask him booking questions, including his full

name, date of birth, home address, and height and weight.  (Id.).  The officers also

asked Dooley if he was hungry, but he said that he did not feel like eating at that

time, and they told him to let them know if he needed anything.  (Id.).  Neither officer

was armed, and they did not make any threats or promises to Dooley.  (Tr. at 43).

Sergeant Atwater and Detective Whaley asked Dooley whether he would speak

with them.  (Gov. Ex. 2 at 9:31:10 to 9:31:35).  Dooley responded by asking them why

he was there.  (Id.).  Sergeant Atwater told Dooley that he wanted to speak with him,

and that he had "been doing this a long time" and could tell that Dooley also wanted

to talk to him, but that there were a couple of things they had to "get out of the way."

(Id.).  Sergeant Atwater then placed a form containing Dooley's Miranda[5] rights in

---

[4] The interview room is a small, carpeted room with a table and three chairs in
it.  (Tr. at 42). Prior to the interview, FBI Special Agent Mike Green ("Agent Green")
is seen on the video standing near the doorway and in the room with Dooley.  See,
e.g., (Gov. Ex. 2 at 9:23:00).  There was some conversation between Dooley and Agent
Green prior to the interview, see (id. at 9:22:50 to 9:25:55), but the government has
not indicated that it intends to offer any of these statements Dooley made to Agent
Green, see infra, fn. 20.

[5] Miranda v. Arizona, 384 U.S. 436 (1966).

front of him on the table and said he wanted Dooley to to read it and sign it, telling him that it gave his rights "just like on T.V."[6] (Tr. at 42-44, 59); see also (Gov. Ex. 3; Gov. Ex. 2 at 9:31:30 to 9:31:50). According to the video recording of the interview, Dooley looked down at the form, appearing to read it,[7] and then asked more questions about why he was there and whether he had been arrested or not, referring to the fact that his car had been wrecked when he was apprehended. (Gov. Ex. 2 at 9:31:50 to 9:33:10); see also (Tr. at 44-45, 59).

Detective Whaley then told Dooley that before they talked any further they had to discuss the Miranda form. (Gov. Ex. 2 at 9:33:10 to 9:34:00). He asked Dooley if he had read the form, and Dooley indicated that he had. (Id.). He asked if Dooley understood the form, and Dooley nodded his head, but did not answer audibly, so Detective Whaley then read the portion of the form recounting Dooley's Miranda rights aloud. (Id.); see also (Tr. at 45). Detective Whaley did not read the "waiver"

_____

[6] After Sergeant Atwater placed the Miranda form in front of Dooley, he said that he knew Dooley had been asking about "[his] girl," (Gov. Ex. 2 at 9:31:59 to 9:32:12), and Dooley said that he wanted to speak with the mother of his child, Desiree Jones ("Jones"), who is a co-defendant in this case, see (id; Tr. at 62-63). Sergeant Atwater told Dooley that Jones was fine and that she would be at the station later on during the day. (Id.).

[7] On cross-examination, Sergeant Atwater agreed with Dooley's counsel that Dooley looked at the form "for all of about two or three seconds," (Tr. at 59), but the video shows that Dooley actually looked down at the form on the table in front of him for about twenty seconds when it was first presented to him, see (Gov. Ex. 2 at 9:31:38 to 9:31:58).

portion of the <u>Miranda</u> form. <u>See</u> (Gov. Ex. 2 at 9:33:10 to 9:34:00). After Detective

Whaley finished reading Dooley his <u>Miranda</u> rights, Dooley again affirmed that he

understood his rights, and when Detective Whaley asked Dooley if, having his rights

in mind, he wanted to talk to the officers, Dooley indicated that he was willing to talk

but that he first wanted to know what the officers were going to ask him about. (<u>Id.</u>

at 9:34:12 (Dooley responding: "Yeah, I mean, I wanna know what's goin' – like

before I say anything I wanna know–what we talkin' 'bout. That's just it" when

asked if he wanted to speak to the officers)); <u>see also</u> (Tr. at 60-61). Sergeant Atwater

then responded by saying that he was interested in finding out what had happened

earlier that day. <u>See</u> (Gov. Ex. 2 at 9:34:00); <u>see also</u> (Tr. at 61).

Although Dooley never signed the <u>Miranda</u> form indicating that he was

waiving his rights, (Tr. at 61), he proceeded to describe the events of earlier that day

and spoke with Segeant Atwater and Detective Whaley for "at least an hour or more

about his whereabouts" throughout the morning, (Tr. at 45). During an

approximately three-hour period, <u>see</u> (<u>id.</u>); (Gov. Ex. 2 at 9:35:00 to 12:17:00),

Dooley's story about the events which had occurred earlier that morning "just went

on and on [and had] different stories that changed,"[8] (Tr. at 46). Ultimately, the

---

[8] For example, Sergeant Atwater testified that Dooley alternatively told the officers he was in the area where he was arrested by the FBI to steal a car, to break into a house, and to rob somebody. (Tr. at 46).

officers brought up other days and events relevant to the investigation, but Dooley "never had a full account of what exactly happened, so he kind of just danced around." (Id.); see also (Tr. at 66-67).

During the interview, Dooley's demeanor was clam, he behaved rationally and he "wasn't terribly upset." (Tr. at 66-67). He did not appear to be under the influence of alcohol or drugs, and he understood the officers' questions and provided logically responsive answers. (Tr. at 47). Dooley did not appear to have any physical injuries, and although he mentioned the accident and that it either scared or startled him, Sergeant Atwater could not recall if he actually complained about any physical injury.[9] (Tr. at 46-47). Dooley never asked for a lawyer or refused to answer questions while Sergeant Atwater was present. (Tr. at 47-48). The interview ended around 12:17 p.m., when Dooley asked to use the restroom. See (Tr. at 47); (Gov. Ex. 2 at 12:17:00).

After Dooley returned from the restroom, Special Agent Paul Szabo ("Agent Szabo")[10] of the FBI stepped into the room to interview Dooley.[11] (Tr. at 66-67, 69);

_____

[9] Sergeant Atwater later testified that Dooley "may have" complained about his shoulder being hurt. (Tr. at 64 (noting that he remembers some conversation about the accident and the police hitting Dooley's vehicle, but that he could not remember word for word what was said)).

[10] Agent Szabo testified that he had first been introduced to Dooley when he arrived at the station. (Tr. at 66-67). The FBI agents who had transported Dooley to the GCPD had already mentioned Agent Szabo's name to Dooley, and Agent Szabo

<u>see also</u> (Gov. Ex. 2 at 12:22:35 to 12:23:10). Agent Szabo spoke "off and on" with Dooley for "a couple of hours," going in and out of the interview room.[12] (Tr. at 69). During this time period, Agent Szabo and Dooley discussed Dooley's alleged involvement in a series of six armored car robberies, trying to establish what Dooley knew regarding each incident. (<u>Id.</u>). At approximately 2:27p.m., Dooley, who was alone in the room,[13] knocked on the interview room door and asked to see Jones. (Gov. Ex. 2 at 14:27:30 to 14:49:00). Agent Szabo was standing in the doorway and responded that it was not a good time for him to see her, and Dooley then indicated that since he was being charged he wanted to call his lawyer. (<u>Id.</u>); <u>see also</u> (Tr. at 63, 68, 70, 80-81). At that moment, Agent Szabo was called away by someone outside the room, and he immediately left the room without saying anything else to Dooley.

---

hoped that Dooley would be willing to speak with him later if he introduced himself early on. (Tr. at 67).

[11] FBI Special Agent Matthew Carmen was also in the interview room at that time. (Tr. at 79); <u>see also</u> (Gov. Ex. 2 at 12:22:35).

[12] During this interview, the questioning was not continuous; "there would be large periods where [Agent Szabo] was not in the room or Dooley would be by himself." (Tr. at 69).

[13] Agent Szabo testified that "maybe 15 minutes, maybe 20 minutes" had passed since he had last been in the interview room with Dooley. (Tr. at 70).

(Gov. Ex. 2 at 14:28:30). Prior to this request, Dooley had not asked for a lawyer or refuse to answer any questions.[14] (Tr. at 70).

A couple of minutes later, Dooley again knocked on the door, and after Agent Szabo came to the door, he again asked to call his lawyer if he was going to be charged. (Gov. Ex. 2 at 14:31:00 to 14:31:55). Agent Szabo informed Dooley that he would be charged, and when Dooley reiterated that he wanted to call his lawyer, Agent Szabo responded that Dooley was free to make that choice but that meant their interview was over, and he explained that Dooley would have to be booked before he could call his lawyer. (Id.). Dooley then again asked to see Jones, and Agent Szabo reiterated that now was not a good time to see her and that it might "be a while" before Dooley would be able to do so. (Id.).[15]

---

[14] Earlier in the day, Dooley had said that he could not give the agents the information they were seeking "without a lawyer," (Gov. Ex. 2 at 12:31:36, 12:46:06), but he did not ask for an attorney until later in the afternoon, see (id. at 14:28:30).

[15] During the time Agent Szabo was interviewing Dooley, Jones was being interviewed in a different room by GCPD Sergeant John Wilbanks ("Sergeant Wilbanks"). See (Def. Ex. 1). During the interview, Sergeant Wilbanks encouraged Jones to convince Dooley to tell the agents the truth. See (id. at 14:19:00 to 14:23:00). Sergeant Wilbanks asked Jones if she would like to speak with Dooley before she left, informing her that it may be the last time that she would get to talk to him for a while. (Id. at 14:19:28). He then explained that the case against Dooley involved a murder and that Dooley needed to think clearly about the consequences of the charges, including the potential for the death penalty, asserting that Dooley was not currently being honest about what he did and his role in the crime. (Id. at 14:19:53 to 14:20:34). Sergeant Wilbanks told Jones that she could speak with Dooley before he left, and he stated that Dooley should be honest about the crimes "for the sake of

Shortly thereafter, Dooley was removed from the interview room and taken to another room where he was being held until he could be transported to the jail.[16] (Tr. at 67-68, 71-72, 81-82). After Dooley had been in that room "somewhere around half an hour," the GCPD officer standing by the door to that room notified Agent Szabo that Dooley had asked to speak to him and said something to the effect of that he wanted to tell Agent Szabo everything. (Tr. at 68, 72-73, 82-83). Agent Szabo went to the room and explained to Dooley that he had already had the opportunity to talk, and that he had asked for a lawyer, but Dooley then indicated that he really wanted to speak again with Agent Szabo and that he would be willing to tell everything. (Id.). At this point, Dooley again asked to see Jones, and Agent Szabo escorted Jones from the room where she had been interviewed to the room that Dooley was in and allowed them to greet one another,[17] and Agent Szabo then escorted Jones back to the room where she had been interviewed. (Tr. at 72-73). Agent Szabo then asked for a new Miranda form, explaining that since Dooley was recontacting him he should be

_____

his children." (Id. at 14:20:50). By the end of this conversation, Jones had agreed that she wanted Dooley to "do the right thing" as the agents were not "playing" and agreed that she was "gonna talk to him." (Id. at 14:22:23 to 14:22:44).

[16] Agent Szabo testified that Dooley was moved to a different room because the room he was in "was an interview room that [law enforcement] may need again." (Tr. at 71).

[17] Agent Szabo testified that Dooley and Jones exchanged "I love yous" and Dooley spoke to Jones' pregnant stomach, addressing her baby. (Tr. at 72).

re-Mirandized.[18]  (Tr. at 73).  Agent Szabo and Sergeant Atwater then went back into the interview room, where the recording had been reactivated, with a <u>Miranda</u> form[19] to talk to Dooley.  (Tr. at 74, 48); <u>see also</u> (Gov. Ex. 3).  Dooley agreed to speak with the officers, <u>see</u> (Gov. Ex. 2 at 15:39:00 to 15:40:00), but did not sign the form, (Tr. at 77); <u>see also</u> (Gov. Ex. 3).  He remained at GCPD answering questions until later that evening.  (Tr. at 78).

## II. DISCUSSION

Dooley seeks to suppress statements he made while in custody because he contends that he invoked his right not to talk to law enforcement authorities and the government cannot establish that he knowingly and voluntarily waived this right.[20]

_____

[18] Agent Szabo does not remember whether he got the <u>Miranda</u> form directly from Sergeant Atwater or if he was simply directed as to where he could locate one within the GCPD.  (Tr. at 73-74).

[19] Sergeant Atwater testified that this form was the same substantive form that had been used earlier that morning when he read Dooley his <u>Mirada</u> rights.  (Tr. at 48).

[20] In his motion to suppress statements, Dooley moved "to suppress all the statements he made to law enforcement officers on March 30, 2011, including those he made after asserting his desire to have counsel present, as well as all statements made <u>before</u> that assertion."  [Doc. 203 at 2].  In his post-hearing brief, Dooley notes that "the Government provided an FBI 302 and other material which suggest that [Dooley] made statements after he was arrested but before he was Mirandized.  At the evidentiary hearing, however, the Government did not put on any evidence regarding those other statements.  For this reason, we assume that the Government does not intend to introduce any statements allegedly made by [Dooley] <u>before</u> Detective Whaley provided <u>Miranda</u> warnings."  [Doc. 393 at 10-11 n.4]; <u>see also</u> (Tr.

[Doc. 393 at 10-15]. Specifically, Dooley contends that he invoked his right to remain silent when he refused to sign the waiver form, and that these actions also mean that the government cannot show he knowingly and voluntarily waived his right. [Id.]. Dooley also asserts that the government wrongfully continued to interrogate him after he invoked his right to counsel. [Id. at 15-23]. Specifically, he contends that the government used Jones to "interrogate" him after he had invoked his right to counsel. [Id.].

In response, the government contends that Dooley expressly and impliedly waived his Miranda rights when he spoke with the officers for several hours until invoking his right to counsel in the afternoon. See [Doc. 401 at 9-16]. The government also contends that agents did not interrogate Dooley after he invoked his right to counsel, and that even if allowing Jones to speak with Dooley constituted "interrogation," they were not permitted to speak until after Dooley had reinitiated

_____

at 57-58). In its response, the government "rejects that assumption," asserting that "the government stated explicitly at the beginning of the evidentiary hearing that it intended to put on evidence only with respect to the statements that had been challenged," insinuating that pre-Miranda statements were not implicated by Dooley's preliminary motion. [Doc. 401 at 9 n.2]. However, the government was on notice from his initial motion that Dooley challenged all statements he made following his arrest on March 30, 2011, and it has presented no basis either through evidence at the hearing on December 16, 2011, or arguments in its post-hearing brief to carry its burden of showing that statements made between the time Dooley was arrested and the time he was read his Miranda rights are admissible. Thus, the Court will address only the statements at issue that have been briefed which are the statements Dooley made after being advised of his Miranda rights.

contact with law enforcement.  [Id. at 17-21].  The Court will address the merits of each of these arguments.

## A.  Whether Dooley Initially Invoked his Miranda Rights

"'*Miranda* warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation.'" United States v. Dudley, Criminal Case No. 1:10–CR–075–CAP–RGV, 2011 WL 1100607, at *4 (N.D. Ga. Feb. 3, 2011), adopted by 2011 WL 1060659, at *1 (N.D. Ga. Mar. 24, 2011) (quoting United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993)). Prior to the initiation of questioning, officers must fully advise a suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires." Miranda, 384 U.S. at 468-70.  Miranda requires that law enforcement respect a suspect's decision to exercise his rights as outlined in the warnings.

Accordingly, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Id. at 473-74.  "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  Id. at 474; see also Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). Any such invocation of the individual's right to remain silent or right to counsel must be unambiguous.  See Berghuis v. Thompkins, 130 S. Ct.

2250, 2259-60 (2010) (citations omitted) (noting that the requirement that such waivers be unambiguous serves the public interest because it aids in prosecuting criminal activity by preventing police from having to make difficult decisions about whether a right has been invoked and face the harsh consequence of suppression if they guess wrong).

Dooley asserts that he invoked his <u>Miranda</u> rights by refusing to sign the waiver form. <u>See</u> [Doc. 393 at 10-12]. However, "it is well-settled law that a refusal to sign a waiver form is not equivalent to an invocation of rights which would render subsequent questioning improper." <u>United States v. Grant</u>, Criminal Action No. 1:09-CR-482-TWT-LTW, 2011 WL 2580867, at *8 (N.D. Ga. May 4, 2011) (citations omitted); <u>see also</u> <u>United States v. Plugh</u>, 648 F.3d 118, 125-26 (2d Cir. 2011); <u>United States v. Boon San Chong</u>, 829 F.2d 1572, 1574 (11th Cir. 1987); <u>United States v. McDaniel</u>, 463 F.2d 129, 135 (5th Cir. 1972).[21] Although he refused to sign the waiver form, Dooley proceeded to speak with the officers, and he never refused to answer questions, stated that he wished to remain silent, or unambiguously asked for a lawyer until approximately 2:27 p.m., at which point the interview ceased. <u>See</u> (Gov. Ex. 2 at 14:27:30 to 14:49:00); <u>see also</u> (Tr. at 63, 68, 70, 80-81). Dooley's course of conduct in

---

[21] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit. <u>Bonner v. City of Prichard, Ala.</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

speaking with the officers was inconsistent with his claim that he invoked his rights by refusing to sign the waiver form.

Although Dooley did mention that he could not give the police the information they were seeking "without a lawyer," see (Gov. Ex. 2 at 12:31:36, 12:46:06), "the mere mention of an attorney and reference to advice from an attorney is not an unambiguous invocation of the right to counsel," United States v. Straker, 596 F. Supp. 2d 80, 92 (D.D.C. 2009) (citations omitted); see also Davis v. United States, 512 U.S. 452, 459 (1994) ("[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning."). Dooley did not clearly invoke his right to counsel until approximately 2:27 p.m., and questioning ceased at that time. See (Gov. Ex. 2 at 14:27:30 to 14:49:00); see also (Tr. at 63, 68, 70, 80-81). Thus, Dooley's motion to suppress his statements on the basis that he invoked his rights prior to that time is due to be denied. See Davis, 512 U.S. at 459-62 (holding that "[m]aybe I should talk to a lawyer" was not an unambiguous invocation of the right to counsel); Sechrest v. Ignacio, 549 F.3d 789, 807 (9th Cir. 2008) (finding defendant's reference to attorney's advice "to keep his mouth shut" was not an invocation of right to counsel, nor were comments such as "maybe [I] ought to see

an attorney" or "I think I would like to talk to a lawyer"); <u>United States v. Peters</u>, 435 F.3d 746, 751-52 (7th Cir. 2006) (observing that circuits have held that a statement such as "I might want to talk to an attorney" or "[d]o you think I need a lawyer?" or a request to call someone about possible representation is too ambiguous to constitute invocation of right to counsel); <u>United States v. Doe</u>, 170 F.3d 1162, 1166 (9th Cir. 1999) (finding continued questioning permissible because defendant's question, "What time will I see a lawyer?" was not clear statement invoking <u>Miranda</u> rights).

**B.     Whether Dooley Validly Waived his <u>Miranda</u> Rights**

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived *[Miranda]* rights' when making the statement."  <u>Berghuis</u>, 130 S. Ct. at 2260 (alteration in original) (<u>quoting</u> <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979)).  "The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"  <u>Id.</u> (<u>citing</u> <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)).  Whether a waiver is knowing and voluntary is a fact-specific inquiry that depends on the totality of the circumstances.  <u>See</u> <u>United</u>

States v. Vanbrackle, 397 F. App'x 557, 562 (11th Cir. 2010) (per curiam) (unpublished); United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *3 (N.D. Ga. Aug. 10, 2007), adopted at *1. The government bears the burden of proving by a preponderance of evidence that Dooley validly waived his Miranda rights. United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997); see also Colorado v. Connelly, 479 U.S. 157, 168-69 (1986).

Dooley asserts that he never waived his Miranda rights because he did not sign the Miranda waiver form. [Doc. 393 at 12-15]. However, as the main purpose of Miranda is to ensure that an accused is advised of and understands his right to remain silent and the right to counsel, waivers can be established absent formal or express statements of waiver.[22] Berghuis, 130 S. Ct. at 2261. Miranda rights may be waived through a "defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." Butler, 441 U.S. at 373. Accordingly, "[w]here the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent. Berghuis, 130 S. Ct. at 2262.

---

[22] Because the undersigned finds that it is clear from Dooley's actions that he impliedly waived the protection of Miranda, the Court need not determine if Dooley's statements preceding the interview amounted to an express waiver of his Miranda rights.

Dooley was given a <u>Miranda</u> warning when he was presented with a form stating his rights and those rights were read aloud to him by Detective Whaley.[23] <u>See</u> (Tr. at 42-44, 59); <u>see also</u> (Gov. Ex. 3; Gov. Ex. 2 at 9:31:30 to 9:31:50). Furthermore, the evidence shows that Dooley twice affirmed that he understood his rights under <u>Miranda</u>. (Gov. Ex. 2 at 9:33:10 to 9:35:00); <u>see also</u> (Tr. at 60-61). Finally, although Dooley did ask for clarification about "what [they were] talking about," he proceeded to speak with the officers off and an for approximately three hours after Sergeant Atwater told him that he wanted to know what had occurred that morning, without refusing to answer questions, invoking his right to remain silent, or asking for a lawyer until 2:27 p.m., at which time the questioning ceased. These actions manifest an implicit waiver of Dooley's <u>Miranda</u> rights. <u>See</u> <u>Berghuis</u>, 130 S. Ct. at 2262 (citation omitted) ("As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford."); <u>United States v. Oliver</u>, 630 F.3d 397, 409-10 (5th Cir. 2011) (finding an implied waiver when the defendant refused to sign the waiver form, but understood his rights and chose to speak with law enforcement); <u>Boon San Chong</u>, 829 F.2d at

_____

[23] Although Detective Whaley did not also read the "waiver" paragraph aloud, reciting the "rights" portion of the <u>Miranda</u> form to Dooley clearly served the warnings purpose of "ensur[ing] an accused is advised of and understands his right to remain silent and the right to counsel." <u>Berghuis</u>, 130 S. Ct. at 2261.

1574 (noting that waiver may be implied when, after being advised of his rights, an accused responds to questions without requesting an attorney).

In addition to showing that Dooley implicitly waived his <u>Miranda</u> rights, the government must carry its burden to show that this implicit waiver was both knowing and voluntary.  <u>See</u> <u>Chirinos</u>, 112 F.3d at 1102; <u>see also</u> <u>Connelly</u>, 479 U.S. at 168-69.  With respect to whether the waiver was knowing, "the totality of the circumstances [] demonstrate [Dooley] waived his rights with a 'requisite level of comprehension,'" <u>United States v. Minard</u>, 208 F. App'x 657, 660 (10th Cir. 2006) (unpublished) (<u>quoting</u> <u>Moran</u>, 475 U.S. at 421), as Dooley, who appeared calm and rational and not otherwise impaired, <u>see</u> (Tr. at 46), was both provided a copy of his <u>Miranda</u> rights to read and read those rights aloud by Detective Whaley, and he twice affirmed that he understood his rights, <u>see</u> (Gov. Ex. 2 at 9:33:10 to 9:35:00); <u>see also</u> (Tr. at 60-61).  The evidence from the videotape of Dooley's interview and testimony presented at the evidentiary hearing show that Dooley's decision to speak with police, implicitly waiving his <u>Miranda</u> rights, was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"  <u>United States v. Wattree</u>, 544 F. Supp. 2d 1262, 1274 (D. Kan. 2008) (internal marks omitted) (<u>quoting</u> <u>Minard</u>, 208 F. App'x at 660).

The evidence before the Court also shows that Dooley's decision to speak with police was voluntary. The voluntariness analysis often depends on whether "the defendant's will was overborne." Lynumn v. Illinois, 372 U.S. 528, 534 (1963). "[C]oercive police activity is a necessary predicate" to finding a waiver involuntary. Connelly, 479 U.S. at 167; see also Moran, 475 U.S. at 421. Here, no coercion was present because even though Dooley was in custody for over 8 hours, see (Tr. at 75-77 (noting that Dooley was arrested between 8 and 9 a.m. and signed the second Miranda waiver at 4:35 p.m. and was questioned until the "evening")), he was not subjected to sustained interrogation as he spoke with police "off and on" and was presented with opportunities to both eat and use the restroom, (Tr. at 47, 69, 78; Gov. Ex. 2 at 9:29:00 to 9:30:55, 12:17:00). After his initial arrest, Dooley was not subject to any violence or threats of violence, was informed of his rights, and was generally cooperative with the agents who were questioning him. See (Tr. at 42-45; Gov. Ex. 2 at 9:33:10 to 9:34:00). Based on these facts, the Court finds that Dooley's statements to investigators were voluntary. See United States v. Cordero, Criminal Case No. 1:11-cr-00009-ODE-RGV, at [Doc. 145 at 43-46] (N.D. Ga. Sept. 13, 2011) (finding statements voluntary where they were made as part of intermittent questioning of defendant during a 12-hour, overnight period despite defendant's lack of familiarity with the American criminal justice system where the defendant was informed of his

rights in his native language permitted to eat, sleep, and use the bathroom and appeared at all times to cooperate with law enforcement).

Although Dooley suggests that agents' threats to arrest Jones, see [Doc. 393 at 19], and their promises to let him see her, see, e.g., [id. at 6, 20], were coercive, the evidence does not show that these actions amounted to police coercion. With respect to comments about arresting Jones, "[a] threat to arrest someone for whom the police have probable cause to arrest does not constitute coercion." United States v. Johnson, 379 F. App'x 964, 968 n.5 (11th Cir. 2010) (per curiam) (unpublished) (citing Thompson v. Haley, 255 F.3d 1292, 1297 (11th Cir. 2001) (concluding that police statements that suspect's girlfriend would be prosecuted unless defendant confessed were not coercive because police had probable cause to arrest her)); see also Martin v. Kemp, 760 F.2d 1244, 1248-49 (11th Cir. 1985) (per curiam). Sergeant Atwater explained to Dooley early in the interview that law enforcement already had probable cause to arrest Jones,[24] see (Gov. Ex. 2 at 10:51:30 to 10:53:30 (explaining how Jones' actions implicate her and noting that due to her involvement she "could go to jail")), and therefore any statements made by the agents concerning her potential arrest were not coercive.

_____

[24] In fact, Jones was subsequently arrested and is currently a co-defendant in this case.

Moreover, although some courts have found that coercion exists where a defendant is threatened with being separated from a loved one, see, e.g., Lynumn, 372 U.S. at 528 (finding that a defendant was coerced by threats that her child would be taken from her unless she cooperated with police where there was also evidence that she was unfamiliar with the criminal justice system and therefore more susceptible to coercion); United States v. Tingle, 658 F.2d 1332, (9th Cir. 1981) (same), "it [is] doubtful that a suspect, told by officers that his wife would be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way," Bishop v. Tucker, No. 3:10cv234/RV/EMT, 2012 WL 1571403, at *18 (N.D. Fla. Apr. 18, 2012), adopted by 2012 WL 1571383, at *1 (N.D. Fla. May 4, 2012) (citing Arizona v. Mauro, 481 U.S. 520, 520 (1987)).  As in Mauro, the totality of the circumstances surrounding the discussions with Dooley regarding whether he would be able to see Jones, his girlfriend, do not support a finding of police coercion, but instead merely demonstrate that Dooley's desire to see and protect Jones may have motivated his behavior.[25]  See United States v. Jackson, 918 F.2d 236, 242 n.7 (1st Cir.

_____

[25] Indeed, the evidence cited by Dooley does not show that law enforcement pressured Dooley to barter truthful information in exchange for seeing Jones, but instead merely that Dooley frequently expressed his desire to see Jones and his concern for her well-being, culminating in him making an offer to exchange information in order to see her.  See [Doc. 393 at 4 (citing (Gov. Ex. 2 at 11:04:10 (Dooley spontaneously offering to answer the agents' questions if they would send Jones home), 5 (citing Gov. Ex. 2 at 13:08:08; Gov. Ex. 2 at 13:41:39 to 13:43:51) (Dooley inquiring as to whether Jones was okay and offering to give information in order to

1990) (citing United States v. Jordan, 570 F.2d 635, 643 (6th Cir. 1978) (finding that statements which were motivated in part by defendant's desire to protect his wife were voluntary); United States v. Charlton, 565 F.2d 86, 88-89 (6th Cir. 1977) (father's confession motivated in part by his desire to protect son not coerced)). Accordingly, the fact that Dooley frequently expressed concern for Jones but was told by law enforcement that he could not see her until later[26] does not demonstrate police coercion, see United States v. Loving, 41 M.J. 213, 243 (U.S. Armed Forces 1994) (finding statement not coerced where defendant asked to speak to girlfriend and although officer told him it was "no problem," the two "just never got together" because police were busy conducting other interviews), and "in the absence of police coercion, a court cannot conclude a defendant's waiver [was] involuntary," Minard, 208 F. App'x at 660.

---

see her)]; see also ( Tr. at 62 (noting that "at some point" Dooley explained that he wanted to speak with Jones), 85 (describing Dooley's offer to "give [law enforcement] Dred" if he was permitted to see Jones); Gov. Ex. 2 at 10:25:00 (Dooley trying to convince agents to let him see Jones by stating that letting him talk to her will "help" law enforcement)).

[26] During his testimony, Agent Szabo explained that the reason he eventually acquiesced to Dooley's requests to see Jones in the late afternoon was because at that point, neither of them were being interviewed by law enforcement any longer. See (Tr. at 72). This statement is consistent with Agent Szabo's explanations to Dooley throughout the day that he could not see Jones because the timing was inconvenient as law enforcement was still interviewing each of them. See, e.g., (Gov. Ex. 2 at 14:31:00 to 14:31:55); see also (id. at 10:40:00 to 10:41:38 (permitting Dooley to see Jones during a break in each of their interviews)).

Therefore, the record demonstrates that Dooley validly waived his <u>Miranda</u> rights. After being informed verbally and visually of his <u>Miranda</u> rights and expressly indicating twice that he understood those rights, (Gov. Ex. 2 at 9:33:10 to 9:35:00); <u>see also</u> (Tr. at 60-61), Dooley implicitly waived his <u>Miranda</u> rights by speaking with law enforcement agents for approximately three hours, providing responsive answers to their questions without invoking his right to remain silent or asking for a lawyer, <u>see</u> (Gov.'s Ex. 2 at 9:35:00 to 12:17:00); <u>see also</u> (Tr. at 45-46). Under the totality of the circumstances as seen in the videotape of the interview, this waiver was both knowing and voluntary, as the evidence does not show that Dooley's will was overborne by any acts of police coercion. <u>See</u> <u>Lynumn</u>, 372 U.S. at 534. Thus, Dooley's motion to suppress statements on the basis that he did not waive his <u>Miranda</u> rights is due to be denied.

## C.    Interrogation after Dooley Invoked his Right to Counsel

Although the evidence shows that Dooley was informed of and initially waived his right to counsel by consenting to speak with law enforcement, the evidence also reveals that he clearly and unequivocally invoked his right to counsel at approximately 2:27 p.m. <u>See</u> (Gov. Ex. 2 at 14:27:30 to 14:49:00); <u>see also</u> (Tr. at 63, 68, 70, 80-81). Accordingly, once Dooley invoked his right to counsel, he could not be "subject to further interrogation by the authorities until counsel [was] made

available to him, unless [Dooley] himself initiate[d] further communication, exchanges, or conversations with the police.'" Edwards, 451 U.S. at 484-85; see also United States v. Nesbitt, 210 F. App'x 975, 976 (11th Cir. 2006) (per curiam) (unpublished) (internal marks omitted) (quoting United States v. Gomez, 927 F.2d 1530, 1539 (11th Cir. 1991)) ("The law in this area is clear: once an accused requests counsel, the officer cannot ask questions, discuss the case, or present the accused with possible sentences and the benefits of cooperation.").  In other words, additional questioning is permitted only if prompted by the defendant, who "waives his previously asserted . . . right to counsel when he reinitiates conversation with law enforcement officers." Nesbitt, 410 F. App'x at 976 (citing Henderson v. Singletary, 968 F.2d 1070, 1072-73 (11th Cir. 1992)).

Dooley contends that he was subjected to interrogation by law enforcement after he invoked his right to counsel. See [Doc. 393 at 15-24].  Although Dooley concedes that he was not directly questioned by law enforcement after he asserted his right to counsel, he contends that he was subjected to interrogation because the law enforcement agents used Dooley's desire to see Jones as a way to elicit information from him. See [id. at 18-23].  Specifically, Dooley objects to the fact that after he clearly and unequivocally invoked his right to a lawyer, see (Gov. Ex. 2 at 14:27:30 to 14:49:00); see also (Tr. at 63, 68, 70, 80-81), he was taken not to a booking

room, but to a holding room where Jones was admitted to see him to "try to get him to talk," [Doc. 393 at 23]. Based on the "repeated discussions throughout the day about letting [Dooley] see [Jones] in exchange for providing information," Dooley asserts that "placing [him] in the same room with [Jones] was unquestionably designed to 'elicit an incriminating response'" constituting impermissible interrogation after he had evoked his right to counsel. [Id.].

The purpose of the <u>Edwards v. Arizona</u> rule is to "protect an accused in police custody from being badgered by police officers . . . ." <u>Oregon v. Bradshaw</u> 462 U.S. 1039, 1043 (1983). As such, all interrogation by police must cease until the defendant himself initiates further communications. <u>Id.</u> Interrogation has been defined by the Supreme Court as either "express questioning or its functional equivalent," <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980), and thus includes "not only [] express questioning, but . . . any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect," <u>id.</u> at 301.

The evidence shows that Dooley asserted his right to counsel at approximately 2:27 p.m. (Gov. Ex. 2 at 14:27:30 to 14:49:00); <u>see also</u> (Tr. at 70). Following this request, Agent Szabo did not further question Dooley. <u>See</u> (Gov. Ex. 2 at 14:28:30 (showing that Agent Szabo immediately left the room after Dooley initially indicated

that he wanted to call his lawyer)); (id. at 14:31:00 to 14:31:55 (showing that when Dooley again summoned Agent Szabo to ask to call his lawyer, Agent Szabo stated that Dooley was free to make that choice but that the interview was therefore terminated, that Dooley would be booked and then permitted to call his lawyer, and that it "was not a good time" for Dooley to see Jones)); see also (Tr. at 63, 68, 70, 80-81). Following Dooley's invocation of his right to counsel, he was taken to another room where he was to be held until being transported to the jail for booking, an action "normally attendant to arrest and custody." Innis, 446 U.S. at 301; see also (Tr. at 67-68, 71-72, 81-83). After approximately half an hour, Dooley reinitiated contact with law enforcement by asking the guard at his door if he could speak with Agent Szabo. See (id.). Even after Agent Szabo explained to Dooley that his invocation of his right to counsel meant that the earlier interview was now over, Dooley insisted that he had changed his mind and was now willing to tell Agent Szabo everything. See (Tr. at 68, 72-73, 82). It was not until this point, after reinitiating contact with law enforcement, that Dooley again asked to see Jones and was permitted to speak briefly with her in Agent Szabo's presence. (Tr. at 72-73).

Dooley asserts that law enforcement used Jones as a tool to interrogate him after he invoked his right to counsel; however, no evidence supports his claim. Although Dooley presented evidence that Sergeant Wilbanks had encouraged Jones

to persuade him to tell the truth, see (Def. Ex. 1 at 14:19:00 to 14:23:00), there is no evidence that law enforcement ever used this "technique" as there is no evidence Jones ever communicated this message to Dooley;[27] indeed, Dooley did not speak with Jones until he had already reinitiated contact with law enforcement and told Agent Szabo he was willing to give him "everything," see (Tr. at 68, 71-73, 81-83), and even during this after-the-fact conversation Dooley and Jones only exchanged "I love yous" while Dooley spoke to her pregnant stomach, addressing the baby she was carrying, see (Tr. at 72). Accordingly, the evidence shows that law enforcement

---

[27] Dooley complains that he was denied his right to cross-examination when he was not permitted to recall Sergeant Wilbanks for questioning about his "technique" of placing subjects together in a room. See [Doc. 393 at 21-22 n.6]. During testimony about his interview of co-defendant Ashley Henderson ("Henderson"), Sergeant Wilbanks mentioned that putting individuals together in one room is a "technique he has used for years," but when Henderson's counsel asked about Sergeant Wilbanks' purpose for using this "technique," the Court sustained the government's relevance objection with respect to the question posed and told Henderson's counsel that he could proceed with another question, but counsel elected not to do so. See (Tr. at 26-28, 88). Near the conclusion of the hearing, Dooley's counsel sought to recall Sergeant Wilbanks to question him about his "technique" of placing subjects together in one room, but the government objected on the basis of relevance, explaining that Sergeant Wilbanks was referring to what happened hours after the initial interviews when Dooley, Henderson, and co-defendant Quentin Booker ("Booker") were all in one room together. (Tr. at 87; see Gov. Ex. 1 at 18:15:20 to 20:48:40). The Court sustained the objection because there was no showing that placing Booker, Dooley, and Henderson in a room together had any connection to Dooley's contention that law enforcement used Jones as a tool to interrogate Dooley since Jones was not in the room. (Id.). Since the subject that Dooley sought to question Sergeant Wilbanks about had no relevance to his contention that Jones was used as a tool to interrogate him, Dooley was not deprived of his right to cross-examination.

officers did not interrogate Dooley after he had invoked his right to counsel until he expressed his renewed desire to talk to Agent Szabo, and Dooley's motion to suppress evidence is due to be denied.[28]

## III. CONCLUSION

For the foregoing reasons and cited authority, it is hereby **RECOMMENDED** that Dooley's motion to suppress statements, [Doc. 203], be **DENIED**.

**IT IS SO RECOMMENDED**, this 6th day of September, 2012.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

[28] Dooley cites <u>Gomez</u> to support his contention that he was subjected to interrogation, [Doc. 393 at 15-17], but the circumstances here do not parallel the pressures in place in that case. <u>See</u> 927 F.2d at 1533. In <u>Gomez</u>, law enforcement officers told Gomez after he invoked his right to counsel that the only way he would receive a lighter sentence was by cooperating, which the Eleventh Circuit ruled would "likely be interpreted by the accused as pressure to respond." <u>Id.</u> Here, in contrast, after Dooley invoked his right to counsel, law enforcement agents did not bring up Jones' name or the prospect of Dooley being able to speak with her or make any statements about Dooley's likely sentence or punishment. <u>See generally</u> (Gov. Ex. 2). Instead, Agent Szabo promptly ended their conversation and only responded to Dooley's subsequent questions by giving concise answers. When Dooley asked if he could see Jones, Agent Szabo simply said that now was not a good time and it might be a while, and he did not state or even suggest that Dooley could see Jones only if he spoke with law enforcement agents. <u>See</u> (<u>id.</u> at 14:31:00 to 14:31:55).